1  Paul H. Burleigh (CA 112512)
   Klinedinst PC
2  777 S. Figueroa Street, Suite 2800
   Los Angeles, CA  90017
3  (213) 401-1100
   (213) 401-1101 facsimile
4  pburleigh@klinedinstlaw.com

5  Ronald P. Schiller (pro hac vice application forthcoming)
   Sharon F. McKee (pro hac vice application forthcoming)
6  Hangley Aronchick Segal Pudlin & Schiller
   One Logan Square, 27th Floor
7  Philadelphia, Pennsylvania  19103
   (215) 496-7020, 7060
8  (215) 568-0300 facsimile
   rschiller@hangley.com
9  smckee@hangley.com

10 *Attorneys for Plaintiff*
   *Ironshore Specialty Insurance Company*

11

12

13            **UNITED STATES DISTRICT COURT**

14        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15 IRONSHORE SPECIALTY                Case No.  3:21-cv-05114
   INSURANCE COMPANY,
16
              Plaintiff,
17                                    **COMPLAINT FOR
   v.                                 DECLARATORY RELIEF**
18
   RODAN & FIELDS, LLC,
19                                    DEMAND FOR JURY TRIAL
              Defendant.
20

21        Plaintiff Ironshore Specialty Insurance Company ("Ironshore" or "Plaintiff")

22 brings this Complaint for Declaratory Judgment against Defendant Rodan & Fields,

23 LLC ("R+F"), and alleges as follows:

24            **NATURE OF THE ACTION**

25        1.    This is an insurance coverage dispute.  Ironshore seeks a declaration

26 pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, that Ironshore

27 does not have a duty to defend or indemnify R+F under the Products/Completed

28

Operations Liability and Professional Liability Policy for Life Sciences No. 002539202, (the "Ironshore Policy" or "Policy") issued by Ironshore to R+F for the Policy Period of July 1, 2017 to July 1, 2018 or under any renewal of the Policy. (A true and correct redacted copy of the Ironshore Policy is attached as Exhibit A and incorporated herein.)

2.      R+F has been named as a defendant in a number of civil actions, including two putative class action lawsuits, where it is alleged that R+F falsely advertised its Lash Boost product as a cosmetic and that R+F withheld important information about adverse health effects associated with Lash Boost's use. In the putative class action lawsuits, the plaintiffs demand refunds of all or part of the fees they paid for Lash Boost.

## PARTIES

3.      Plaintiff Ironshore Specialty Insurance Company is an Arizona corporation with its principal place of business in Massachusetts.

4.      Upon information and belief, Defendant Rodan & Fields, LLC is organized under the laws of Delaware and has its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action pursuant to 28 U.S.C. §§ 1332, 2201, and 2202.

6.      There is complete diversity between Plaintiff and Defendant and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      As set forth below, there is an actual controversy between the parties.

8.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because it is the district where R+F has its principal place of business and where a substantial part of the events giving rise to this action occurred.

9.     <u>Intra-District Assignment</u>:  This action is properly assigned to the San Francisco/Oakland Division.  R+F has its principal place of business in San Francisco and a substantial part of the events giving rise to this action occurred in San Francisco.

## FACTUAL ALLEGATIONS

### The Underlying Actions

10.     R+F markets a product called Lash Boost, a serum that purportedly gives eyelashes a fuller, longer appearance when applied to the roots of the eyelashes.

11.     R+F is a defendant in two putative class action lawsuits, one pending in the U.S. District Court for the Northern District of California, and the other in the Superior Court of San Francisco County (collectively, the "Putative Class Action Lawsuits").

12.     The federal action, captioned *Lewis v. Rodan & Fields, LLC*, Civ. A. No. 4:18-2248, purports to assert consumer protection claims on behalf of consumers in California, Florida, Illinois, Massachusetts, New York, and Washington, as well as a nationwide class alleging a violation of the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     The *Lewis* Consolidated Complaint, filed on August 14, 2018, alleges that R+F failed to disclose the harmful side effects linked to one Lash Boost ingredient, isopropyl cloprostenate, in the Lash Boost marketing and label.  The *Lewis* plaintiffs contend that they would not have purchased Lash Boost had they known about these harmful side effects, and they seek a refund of monies that R+F allegedly has obtained by means of its supposedly deceptive or unfair marketing or labeling of Lash Boost.  (A true and correct copy of the Consolidated Complaint is attached hereto as Exhibit B.)

14.     In the California state-court putative class actions, coordinated in the

Superior Court of California, County of San Francisco under the caption *Lash Boost Cases*, CJC18004981, the named plaintiffs seek to represent a class of California buyers of Lash Boost.  The *Lash Boost Cases* consist of two lawsuits captioned *Scherr v. Rodan & Fields, LLC*, Superior Court of California, County of San Bernardino, Case No. CIVDS 1723435 and *Gorzo v. Rodan & Fields, LLC*, Superior Court of California, County of San Francisco, Case No. CGC-18-565628. (A true and correct copy of the *Scherr* First Amended Complaint and the *Gorzo* First Amended Class Action Complaint are attached hereto as Exhibits C and D, respectively.)

15.     Both the *Scherr* and *Gorzo* complaints allege that R+F failed to disclose the harmful side effects linked to isopropyl cloprostenate in the Lash Boost marketing and label.  The *Scherr* and *Gorzo* plaintiffs contend that they would not have purchased Lash Boost had they known about these harmful side effects linked to isopropyl cloprostenate, and seek a refund and/or disgorgement of monies that R+F allegedly has obtained by means of its supposedly deceptive or unfair marketing or labeling of Lash Boost.

16.     R+F has also been sued by a number of individual consumers, who make similar allegations concerning Lash Boost, and – unlike the Putative Class Action Lawsuit plaintiffs – assert putative personal injury claims (collectively, the "Individual Lawsuits").  Upon information and belief, the Individual Lawsuits include:

      a.  *Barrett v. Rodan + Fields*, Superior Court of California, County of San Francisco, Case No. CGC-19-579766;

      b.  *Copeland v. Rodan & Fields, LLC*, M.D. Fla., Civ. A. No. 6:21-171; and

      c.  *Herrin v. Rodan & Fields*, Superior Court of North Carolina, County of Mecklenburg, No. 20-CvS-10641.

17.     The Putative Class Action Lawsuits and the Individual Lawsuits (collectively, the "Underlying Actions") generally allege that the active ingredient included in R+F's Lash Boost product, isopropyl cloprostenate, was originally used in glaucoma medication and had a side effect of promoting eyelash growth.  The Underlying Actions also allege that Latisse – a product that is allegedly similar to Lash Boost and contains isopropyl cloprostenate – received premarket approval by the U.S. Food and Drug Administration under the Food, Drug and Cosmetic Act. However, the Underlying Actions allege that eyelash conditioners, like Lash Boost, are drugs under the California Health and Safety Code and cannot be sold without regulatory approval.  Further, the Underlying Actions allege that a manufacturer of another eyelash serum similar to Lash Boost received a warning letter from the FDA advising it that the eyelash serums it manufactured for other companies qualified as prescription drugs requiring premarket approval.

18.     The Underlying Actions generally allege that R+F knew that Lash Boost was a drug and that its active ingredient was associated with adverse side effects.  Despite this knowledge, the Underlying Actions allege that R+F falsely marketed Lash Boost as a cosmetic and deliberately concealed the potential adverse side effects associated with its use from consumers.

19.     The Underlying Actions do not allege that R+F performed services of a professional nature for a fee, remuneration, or other consideration.

20.     Upon information and belief, on May 13, 2021 R+F and the *Lash Boost Cases* plaintiffs advised the court that they had reached a settlement of the Putative Class Action Lawsuits.  A hearing concerning this proposed settlement is set for August 3, 2021.

### The Ironshore Policy

21.     Ironshore issued the Policy to R+F, effective July 1, 2017 to July 1, 2018.

22. The Policy provides several types of coverage, two of which are at issue here: Insuring Agreement A, Products/Completed Operations Bodily Injury and Property Damage Liability Insurance; and Insuring Agreement B, Professional Liability Insurance.

23. Both Insuring Agreements A and B have a liability limit of $10,000,000 for each Occurrence and aggregate for all **Claims** first made during the **Policy Period**.[1]

24. Insuring Agreements A and B are subject to a self-insured retention ("SIR") of $250,000 each Occurrence.

25. Insuring Agreement A states:

> We will pay **Damages** that the **Insured** becomes legally obligated to pay because of a **Claim** alleging **Bodily Injury** or **Property Damage** caused by an **Occurrence**, provided that
>
> 1. the **Bodily Injury** or **Property Damage** is included with the **Products-Completed Operations Hazard** to which this insurance applies;
>
> 2. the **Bodily Injury** or **Property Damage** takes place on or after the Retroactive Date and prior to the expiration date of the **Policy Period**;
>
> 3. the **Occurrence** takes place in the **Coverage Territory**; and
>
> 4. the **Claim** was first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and was reported to us as required by SECTION V, Condition A. A **Claim** will be deemed first made as set forth in SECTION V, Condition B.

26. Insuring Agreement B states:

> We will pay **Damages** that the **Insured** becomes legally obligated to pay because of a **Claim** alleging a **Wrongful Act** by the **Insured** or by a party for whose conduct the **Insured** may be legally responsible in

---

[1] All capitalized and bolded terms are defined in the Policy.

rendering or failing to render **Professional Services** . . . , provided that

1.  the **Wrongful Act** takes place on or after the Retroactive Date and prior to the expiration date of the **Policy Period**;

2.  the **Wrongful Act** takes place in the **Coverage Territory**; and

3.  the **Claim** was first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and was reported to us as required by SECTION V, Condition A.  A **Claim** will be deemed first made as set forth in SECTION V, Condition B.

27.  Section VII of the Policy, "**DEFINITIONS**," provides, in part:

D.  **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish, including emotional distress or humiliation; mental illness; or mental injury.  **Bodily Injury** also means bodily injury, sickness, disease, mental injury or mental anguish sustained by any relative of that person as a result of such **Bodily Injury**.

F.  **Claim** means a written demand for **Damages**, services or other non-monetary relief.  A **Claim** includes a **Suit**.

K.  **Damages** mean any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**.

**Damages** shall include:

1.  a plaintiff's attorney's fees and court costs, but only in an amount equal to the percentage that the amount of monetary damages covered under this Policy for any settlement or judgment bears to the total amount of such settlement or judgment;

2.  pre- and post-judgment interest awarded or imposed in any judgment, and premiums on appeal bonds required to be furnished with respect to any such judgment; and

3.  punitive or exemplary damages where insurable by law; provided that the jurisdiction most favorable to the insurability of punitive damages shall control the insurability of such punitive damages, so long as such jurisdiction;

          (i)     is where such punitive damages were awarded or imposed;

          (ii)    is where the **Bodily Injury**, **Property Damage**, or **Wrongful Act** took place;

          (iii)   is where the **Named Insured** is incorporated or otherwise organized, or has a place of business; or

          (iv)   is where the Company is incorporated or has its principal place of business.

**Damages** do not include:

1. civil or criminal fines, sanctions, penalties or forfeitures;

2. the multiplied portion of multiplied damage awards;

3. non-monetary, injunctive, declaratory or equitable relief or amounts owing in order to effectuate such relief;

4. the return, refund or restitution of fees or other charges for **Your Product**, **Your Work** or your services;

5. amounts, incurred to modify, redesign or correct **Your Product**, **Your Work** or your services, other than expenses covered under Insuring Agreement D; or

6. amounts that are not insurable under any applicable law.

OO.  **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

WW.  **Professional Services** means services of a professional nature performed by you or any other **Insured** on your behalf, including advice given by you with respect to the use of **Your Product** or **Your Work** for a fee, remuneration or other consideration in connection with a **Life Sciences Product**.

GGG.  **Wrongful Act** means any actual or alleged negligent act, error or omission in the rendering of, or failure to render **Professional Services** to which this insurance applies.

28.    Exclusion C.1 to the Policy applies to Insuring Agreement B and states that the Policy will not apply to any **Claim** which is covered under Insuring Agreement A.

29.     The Policy includes a number of other exclusions that bar or limit coverage for the Underlying Actions.

30.     *First*, Exclusion A.1 Contractual Liability states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving the **Insured**'**s** assumption of liability or obligations in a contract or agreement. Exclusion A.1 does not apply to any liability or obligations that the **Insured** would have in the absence of the contract or agreement; or that the **Insured** "assumed in an **Insured Contract**, provided that the **Bodily Injury**, **Property Damage** or **Wrongful Act** occurs subsequent to your execution of the **Insured Contract**." This exception further states that it "only applies to the extent of any limits or coverage required by the **Insured Contract**. Solely for the purposes of the coverage provided by this subparagraph (b), we will treat as **Damages** any attorneys fees or litigation expenses for which you are liable under such **Insured Contract**."

31.     The Policy defines an **Insured Contract** in part as "that part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay damages for a **Wrongful Act** or for **Bodily Injury** or **Property Damages** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."

32.     *Second*, Exclusion A.7 Prior Acts states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

> an **Occurrence**, **Wrongful Act** or **Circumstance**:
>> b.  of which you had knowledge or information, prior

to the first inception date of continuous claim-made coverage with us, which knowledge or information a reasonable person would believe might result in a **Claim**. This includes any **Occurrence**, **Wrongful Act** or **Circumstance** which began or took place before the inception date of the Policy and which is covered under any batch, integrated occurrence or extended coverage language in any other policy issued to you prior to the inception date of this Policy. . . .

33.     *Third*, Exclusion A.13 Banned Materials states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

**Your Product** or **Your Work** that is manufactured, developed, designed, created, tested, sold, leased, licensed, rented, handled, marketing, distributed or disposed of by you or others on your behalf in known violation of any law, statute, ordinance or regulation.

34.     *Fourth*, Exclusion A.14 Dishonest, Fraudulent, Criminal or Malicious Acts states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

a.  willful misconduct or willfully dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**; or

b.  willful violation by any **Insured** of any law, statute, ordinance or regulation.

However, . . . we will defend the **Insured** against such **Suit**, unless or until it has been determined that this exclusion applies. Determination of the applicability of this exclusion may be made by an admission or by a final adjudication in a proceeding constituting the **Claim** or in a proceeding separate from or collateral to any proceeding constituting the **Claim**.

35.     *Fifth*, Exclusion A.15 Misappropriation of Funds states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are

based upon, arising out of, directly or indirectly resulting from or in any way involving:

> the conversion, commingling, misappropriation or improper use of funds or other property, or the gaining of any personal profit or advantage to which the **Insured** is not legally entitled.

36.     *Sixth*, Exclusion A.16 Insured's Fees or Other Remuneration states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

> a dispute over fees, remuneration or other compensation charged by the **Insured** for **Professional Services**.

37.     *Seventh,* Exclusion A.21 Off-Label Promotion states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreements A or B which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

> your promotion of off-label or unapproved uses for drugs or medical devices approved by the Food and Drug Administration for other uses.

38.     *Eighth,* Exclusion B.8 Professional Services states that the insurance provided by the Policy does not apply to **Damages** or **Defense Expenses** incurred in connection with a **Claim** under Insuring Agreement A which are based upon, arising out of, directly or indirectly resulting from or in any way involving:

> the rendering of or failure to render **Professional Services** by you or another party for whose conduct you may be legally responsible.  However, this exclusion does not apply to **Damages** or **Defense Expenses** resulting from **Your Work** as a **Life Sciences Product Sales Contractor** or **Life Sciences Product Services Contractor**.

39.     The Policy includes several Conditions that are at issue here.

40.     Section V.A.2.b and c. Conditions provides, in part, that the **Insureds**

must:

    (i)    immediately send us copies of any demands, notices, summonses or legal papers received in connection with the **Claim** or **Suit**;

    (ii)    authorize us to obtain records and other information;

    (iii)    cooperate with us in the investigation or settlement of the **Claim** or defense against the **Suit**; and

    (iv)    assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the **Insured** because of injury or damages to which this insurance may also apply.

No **Insured** will, except at that **Insured's** own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

41.    Section V.D Other Insurance states that the Policy is primary except where the provisions of Sction V.D.2 Excess Insurance apply.  If the **Insured** has other insurance that is also primary, Ironshore will share with all that other insurance.  Where all of the other insurance permits contribution by equal shares, Ironshore follows that method.  Otherwise, Ironshore will contribute by limits.

**The Coverage Dispute**

42.    R+F notified Ironshore of the Putative Class Action Lawsuits after they were filed in or about April 2018.

43.    Ironshore initially disclaimed coverage, in June 2018, for the *Scherr* Action because it did not allege any claims that were potentially covered.

44.    After R+F submitted an amended *Scherr* complaint to Ironshore, Ironshore issued a reservation of rights letter regarding the Putative Class Action Lawsuits on October 4, 2018.  Ironshore agreed to defend the actions subject to a full reservation of Ironshore's rights, including the right to seek a judicial determination of the parties' rights and duties, the right to disclaim coverage as further information became available, and the right to recoup defense costs.

45.    In its reservation of rights letter, Ironshore reminded R+F of its duties

under the Policy and California Civil Code § 2860(d) to cooperate with Ironshore and immediately provide Ironshore with copies of filings in the action.  Ironshore provided R+F with a copy of its litigation guidelines and advised R+F of the maximum rates that it would pay for **Defense Expenses**.

46.     Ironshore has also reserved its rights with regard to the Individual Lawsuits.

47.     Notwithstanding its statutory and contractual duty to cooperate with Ironshore with respect to the Putative Class Action Lawsuits and Individual Lawsuits, R+F has repeatedly breached these duties.

48.     R+F failed to disclose to Ironshore until February 11, 2019, that a third party (the "Indemnitor") has a duty to indemnify R+F and that the Indemnitor and/or one or more of its insurers were defending R+F in the Lash Boost litigation. In June and August 2019, Ironshore asked R+F to provide a copy of the indemnification agreement, the other insurance policies, Acord forms, and coverage correspondence from the Indemnitor's carriers.  R+F ignored these requests and did not begin to provide some of the materials requested until July 29, 2020, when R+F first gave Ironshore a copy of the indemnification agreement.

49.     In breach of its duties under the Policy, R+F has refused to provide information that Ironshore requested regarding the respective positions of the Indemnitor and R+F concerning the applicability of the indemnification agreement to the R+F's potential liability to the plaintiffs in the Underlying Actions.

50.     The terms of the indemnification agreement take precedence over any duty of defense or indemnification that Ironshore otherwise might have under the Ironshore Policy.

51.     R+F did not promptly provide Ironshore with copies of filings in the Underlying Actions, seek prior approval for defense expenses, or allow Ironshore to associate in defense of the Underlying Actions.

52.     Despite notifying Ironshore of a number of individual claims, R+F has never provided requested updates or sought Ironshore's approval for any resolution of those claims.

53.     Apparently recognizing that it did not have any basis to seek coverage for defense expenses, R+F never submitted any defense invoices to Ironshore until March 30, 2021.

54.     R+F agreed to engage in mediation of the Putative Class Action Lawsuits and the *Barrett* action, and hired several mediators, without first consulting Ironshore or obtaining Ironshore's consent.  Although Ironshore has participated in the mediation, Ironshore promptly advised R+F that it did not agree to pay in whole or in part for the services of more than one mediator.

55.     Although it is clear that R+F is not entitled to a defense or indemnification under the Ironshore Policy for the Putative Class Action Lawsuits – including, without limitation, the proposed settlement that, upon information and belief, R+F reached on or about May 13, 2021 – R+F has disputed Ironshore's coverage position and threatened to sue Ironshore.

## COUNT I

## DECLARATORY JUDGMENT - 28 U.S.C. §§ 2201-2202

56.     Ironshore repeats and incorporates by reference the allegations in Paragraphs 1 through 55 of this Complaint.

57.     This is a claim for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.  Ironshore seeks a judicial determination of the rights and duties of Ironshore and R+F under the Policy.

58.     In the Underlying Actions, the plaintiffs seek injunctive relief, disgorgement, restitution, refunds of the Lash Boost purchase price, and punitive damages.

59.     Ironshore is entitled to a judicial declaration that coverage under the

Policy is barred, in whole or in part, because the relief sought or obtained in the Underlying Actions does not qualify as **Damages** as defined by the Policy.

60.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, because the relief sought or obtained in the Underlying Actions is not insurable under applicable law.

61.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Insuring Agreement A because the Underlying Actions are not **Claims** alleging **Bodily Injury** or **Property Damage** caused by an **Occurrence**.

62.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Insuring Agreement B because the Underlying Actions are not **Claims** alleging a **Wrongful Act** by R+F or by a party for whose conduct R+F may be legally responsible in rendering or failing to render **Professional Services**.

63.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Insuring Agreement B to the extent that any **Claim** is covered under Insuring Agreement A, in accordance with Exclusion C.1 to the Policy.

64.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.1 to the extent that R+F assumed liabilities or obligations in a contract or agreement and no exception to Exclusion A.1 applies.

65.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.7.b because the Underlying Actions allege that R+F knew or should have known before October 8, 2015 that the active ingredient in Lash Boost was associated with adverse side effects, that at least one competing product was subject to FDA approval, and that a manufacturer

had been warned in 2011 by the FDA that competing products containing the same active ingredient had been determined to be drugs subject to FDA approval.

66.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.13 because R+F allegedly marketed and distributed Lash Boost in known violation of the federal and state statutes regulating the marketing and distribution of drugs.

67.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.14 because the Underlying Actions allege that R+F willfully violated federal and state laws governing the marketing and distribution of drugs and consumer products.

68.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.15 to the extent that R+F is required or agrees to refund the Lash Boost purchase price or disgorge its Lash Boost income and profits.

69.     Ironshore is entitled to a judicial declaration that to the extent that R+F is entitled to coverage under Insuring Agreement B of the Policy, coverage is barred, in whole or in part, under Exclusion A.16 because the Underlying Actions seek the refund of all or part of the Lash Boost purchase price and constitute a dispute over fees, remuneration or other compensation charged by R+F.

70.     Ironshore is entitled to a judicial declaration that coverage under the Policy is barred, in whole or in part, under Exclusion A.21 because the Underlying Actions allege that Lash Boost is a drug that R+F has promoted for off-label or unapproved uses.

71.     Ironshore is entitled to a judicial declaration that in the event that R+F is entitled to coverage under Insuring Agreement A of the Policy, coverage is barred, in whole or in part, under Exclusion B.8 to the extent that the Underlying Actions purportedly involve liability due to rendering or the failure to render

**Professional Services** by R+F or another party for whose conduct R+F may be legally responsible and no exception to Exclusion B.8 applies.

72.     Ironshore is entitled to a judicial declaration that R+F has failed to satisfy a condition precedent to coverage and has materially breached its duties under the Policy by its failure to cooperate with Ironshore.

73.     Ironshore is entitled to a judicial declaration that R+F has materially breached its duties under the Policy and is not entitled to reimbursement of any **Defense Costs** incurred because R+F has failed to obtain prior approval for those costs and failed to timely submit invoices to Ironshore.

74.     Ironshore is entitled to a judicial determination that R+F is not entitled to reimbursement of any defense costs incurred in the Underlying Actions under the Policy or the law because the costs are excessive and unreasonable.

75.     Ironshore is entitled to a judicial determination that, to the extent that the Ironshore Policy provides primary coverage and R+F is entitled to other insurance coverage that also is primary, Ironshore is required to pay only its share as determined under Condition D of the Policy and applicable law.

76.     Ironshore is entitled to a judicial determination that R+F is not entitled to coverage under the Policy because R+F is entitled to a defense and indemnification from the Indemnitor and the Indemnitor's duties are not subject to a monetary cap.

77.     Ironshore is entitled to a judicial determination that it is not obligated to fund the proposed settlement of the Putative Class Action Lawsuits.

78.     Ironshore reserves the right to assert additional grounds for declaratory relief as this lawsuit progresses.

79.     A judicial decision is necessary and appropriate at this time so that the parties may ascertain their rights under the Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ironshore Specialty Insurance Company requests that the Court enter judgment in its favor as follows:

1. A judgment declaring that Ironshore does not have a duty to defend or indemnify R+F in the Underlying Actions; and

2. For Ironshore's costs of suit herein and for such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Ironshore Specialty Insurance Company hereby demands a jury trial on all issues and claims so triable.

KLINEDINST PC

Dated: July 1, 2021

By: / s / Paul H. Burleigh

Paul H. Burleigh (CA 112512)
777 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017
T: 213 401 1100
F: 213 401 1101
E: pburleigh@klinedinstlaw.com

and

Ronald P. Schiller (*pro hac vice*
application forthcoming)
Sharon F. McKee (*pro hac vice*
application forthcoming)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
Telephone: (215) 568-6200
Facsimile: (215) 568-0300
rschiller@hangley.com
smckee@hangley.com

*Counsel for Ironshore Specialty
Insurance Company*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF SERVICE**
COMPLAINT OF FOR DECLARATORY RELIEF